### 9471

SLOAN v. J. G. WHITE ENGINEERING CO. *ET AL.*

(89 S. E. 964.)

1. TRIAL — INJURIES TO SERVANT — INSTRUCTIONS — CHARGE ON FACTS— "DILIGENCE"—"PRUDENCE"—"REASONABLE CARE."—In action for death of servant, a charge as to duty of master to use care, defining "prudence," "diligence," and "reasonable care" to "mean more than mere mechanical skill," and that "it includes circumspection and foresight in regard to reasonably probable contingencies and must be proportionate to the danger," is not error as a charge on the facts.

2. MASTER AND SERVANT— INJURIES TO SERVANT— ACTION— BURDEN OF PROOF—"ACT OF GOD."—In action for death of servant struck by lightning alleged to have come over negligently ungrounded wire into power house where he was working, it appearing that the proper grounding of the wire was a matter within the particular knowledge of defendants, defendants, pleading act of God, had the burden of proving that lightning was the sole cause and did not concur with their own negligence, for in law "act of God" means not only *vis major*, but a *vis major* uncoupled with negligence.

3. TRIAL—INSTRUCTIONS—BURDEN OF PROOF.—In such action, where the plaintiff undertook to prove the alleged negligence of defendants and defendants offered evidence contra, an instruction, in effect telling the jury that on that issue the testimony of the defendants must preponderate, was proper, since that was the only thing which could excuse the killing.

4. Master and Servant—Action—Question for Jury—Negligence of Master.—In such action, evidence that the wire was coiled about projecting bushings outside the power house and not grounded at that place, but 200 feet away; that the lightning came into the power house thereby—*held* to warrant sending the issue of defendant's negligence to the jury.

5. Evidence — Judicial Notice — Electricity. — Courts take judicial notice of the fact that for well-nigh a generation the ingenuity and the resources of men have been exploiting the power of electricity.

Before Wilson, J., Columbia, March, 1915. Affirmed.

Action by Lizzie Sloan, administratrix, against J. G. White Engineering Company and others. From a judgment for plaintiff, the named defendant and General Electric Company appeal.

The exceptions, referred to in the opinion, were as follows:

The J. G. White Engineering Company and the General Electric Company presented the following exceptions:

1. His Honor, the Circuit Judge, overruled defendants' motion for direction of verdict based on the ground that there was no evidence of actionable negligence adduced. This constituted error: (a) In that the evidence failed to show any negligence as alleged on the part of either of the defendants; (b) the only testimony to support the allegations of negligence was admittedly based upon one of several theories as to how the fatality might have occurred.

2. His Honor, the Circuit Judge, overruled defendants' motion for a direction of verdict, based on the ground that the only reasonable inference to be drawn from the entire evidence was that Frank A. Sloan came to his death by reason of an act of God. This constituted error, in that the only reasonable inference to be drawn from the evidence

Footnote.—As to the act of God as a defense in action by servant against master, see note in 49 L. R. A. (N. S.) 198.

was that plaintiff's intestate came to his death by reason of a stroke of lightning which was the sole proximate cause thereof.

3. Each of the defendants-appellants, on the grounds contained in the first and second exceptions hereinabove set out, individually and severally charge error in the overruling of the motion to direct a verdict as to it.

4. His Honor charged plaintiff's eighth request, as follows: "Eighth. I charge you that the plaintiff sets out that Sloan, plaintiff's intestate, came to his death from an electric current caused from lightning striking the wires and running over them into the substation and going through the body of Sloan, killing him. The answers of the defendant companies admitted that Sloan was killed by lightning passing over a wire and entering the building, but denied any acts of negligence on their part, and set up the defense that it was the act of God; and I am asked to charge you the following: An act of God is defined as any accident due to natural causes directly and exclusively without human intervention, such as could not have been prevented by any amount of foresight and pains and care reasonably to have been expected; and the defendant who invokes the act of God as a defense has the burden of proving, not only that the act of God caused the injury, but that it was the entire cause of the injury, and such injury could not have been prevented by the exercise of diligence, prudence, and reasonable care by the defendant; that prudence, diligence, and reasonable care means more than mere mechanical skill. It includes circumspection and foresight in regard to reasonably probable contingencies, and must be proportionate to the danger; that acts and occurrences which arise from negligence cannot be attributed to the act of God. Where the defense is negligence and such negligence combines and concurs in producing the injury, the master is nevertheless liable. As I have said before, the act of God must be the sole cause of the injury or death. I so charge you"—the error

being: (a) That his Honor thereby charged that prudence, diligence, and reasonable care means more than mechanical skill, and he thereby instructed the jury that the use of mechanical skill was not ordinary care under the circumstances, thus substituting his own judgment for that of the jury and constituting a charge upon the facts; (b) that said charge held the defendants to a higher degree of proof to establish what constituted an act of God than the law requires.

A. That his Honor, the Circuit Judge, erred in allowing the amendments proposed by counsel for plaintiff-respondent to be incorporated in the case for appeal to the Supreme Court, because said amendments are unnecessary and irrelevant, and do not conform to the requirements fixed and established by the Supreme Court, and tend merely to confuse the issues and to enlarge the record on appeal.

The J. G. White Engineering Company, in addition to the exceptions above set forth, presented the following:

5. His Honor charged plaintiff's second request as follows: "(2) I charge you that it is the duty of any corporation or person engaged in working near or in proximity to the employees of another person or company engaged in their duties to exercise such reasonable care as may be necessary under the circumstances as not to injure the employee of the other person or company, and if an employee of the other person or company is injured or killed by an act of negligence of its acts, then such person or corporation would be liable to the person injured or killed, unless he also contributed to his own injury as a direct and proximate cause thereof." This constituted error in that: (a) It made the J. G. White Engineering Company the insurer of the safety of plaintiff's intestate, whereas the law imposed upon it only the duty to observe reasonable care under the circumstances; (b) the said charge imposed upon the J. B. White Engineering Company the necessity of using not a reasonable degree of care, but an adequate degree of care to prevent

the injury, which was a greater burden than the law requires under such circumstances.

6. His Honor, upon the objection of plaintiff's attorney, decided to allow the attorney for J. G. White Engineering Company to prove by witness, E. W. Robertson, that the real defendant in the case was the Columbia Railway, Gas and Electric Company, of which Mr. E. W. Robertson was president; the error being that his Honor thereby declined to allow proof as to who was the real party in interest.

*Messrs. Barron, McKay, Frierson & Moffatt,* for General Electrict Co., appellant, submit: *The evidence failed to show any negligence on the part of any defendant:* 72 S. C. 404; 160 Fed. 348, 352; 96 Me. 207; 52 Atl. 771; 90 Am. St. Rep. 335; 191 Fed. 776; 200 Fed. 553; 4 Labatt, M. &. S., sec. 1604; 109 Am. St. Rep. 881, 885.

*Messrs. Elliott & Herbert,* for J. G. White Engineering Co., appellant.

*Mr. Lawson D. Melton,* for J. W. Odiorne, appellant.

*Messrs. W. Boyd Evans* and *Porter A. McMaster,* for respondent, cite: *As to issue for jury:* 91 S. C. 22; 99 S. C. 200. *Charge as to care to be used in connection with electric wires:* 69 S. C. 607; 25 S. C. 24; 43 Atl. 655; 21 L. R. A. 570; 31 *Ib.* 583 and 589; 24 Am. St. Rep. 614; 89 Tenn. 423; 40 L. R. A. 799; 53 Pac. 14; 177 Mass. 15; 90 S. C. 40. *Act of God as defense:* Harper 468; 1 A. & E. Enc. L. (1st ed.) 174; 65 S. C. 543; 2 Speer 197; 2 Bailey 157; 29 S. C. 101; 65 S. C. 500; 4 Kent Com. 597.

July 17, 1916.

The opinion of the Court was delivered by MR. JUSTICE GAGE.

Action for a tort to the person; recovery $12,500; appeal by the defendants.

The defendants were sued as joint tort-feasors for the electrocution of a young man named Sloan, who came to his death under circumstances of so complex a character as to call for a rather long statement of them. A dam had been constructed across Broad River, 25 miles north of Columbia, at a place called Parr Shoals, to create water power for the generation of electricity. Copper wires had been strung on steel towers from Parr Shoals toward Columbia, and having for the terminus at Columbia a power house at the foot of Gervais street. These copper wires are called the transmission line. The power house was constructed of steel, brick, and cement, and the interior of it was for the reception, the storing, and the distribution of electric power sent hither from Parr Shoals over the transmission line. The electric current from Parr Shoals had not been yet applied; the equipment therefor had not been completed. Somewhere betwixt Parr Shoals and Columbia, at the slaughter pen some three miles from Columbia, there was a break in the transmission lines; that is to say, the line was not yet continuous from Parr Shoals to Columbia. From the power house and towards the north, which is towards Parr Shoals, there were several miles of continuous line. Just at the power house, on the northern side of it, the transmission line stopped short on the outer wall of the power house as is next described. On that side of the wall of the power house, and running through the wall, there were bushings. This appliance was set to receive the transmission wire and take it through the wall into the power house. The bushings projected some 24 inches beyond both the inner and outer walls, and preparatory to insertion in and through the bushings, the transmission line was coiled around the projecting bushings on the outer wall, and thus remained for several months before the accident. There was admittedly no grounding of the trans-

mission line just at the power house.  A witness for the defendants named Murphy testified that he grounded the transmission line at the second tower from the power house, about 200 feet away; and a witness named Rossman testified the transmission line was grounded at the slaughter pen some few miles north of the power house, and also at the steel tower on the canal bank still nearer to the power house. The workman, Sloan, was on a scaffold inside the power house, near the bushings, and with his back to the inner wall, and his fellow workman, Wilson, was a few feet from Sloan and facing Sloan.   These men were working for the General Electric Company, and were installing apparatus inside the power house.   The transmission line was erected by the John G. White Company.   A cloud suddenly gathered in the heavens in the vicinity of the power house, there was some thunder, a slight precipitation, a report as of a 22-caliber rifle, and the instantaneous electrocution by lightning of the worker, Sloan.

The plaintiff asserts that lightning hit the transmission line; that there was insufficient grounding or no grounding of the line; that the lightning passed from the line coiled around the bushing into the wall of the power house, through the steel plates set in the wall into Sloan's body.   The defendants assert that Sloan met his death by a freak of lightning and through no fault of theirs.   And that is the case.

There are six exceptions to the proceedings had in the trial Court; they will be reported.   That set out last will be considered first.

1. The defendants offered a witness, E. W. Robertson, to prove that the J. G. White Company built the transmission line merely as the hand of the Columbia Railway, Gas and Electric Company, and that the omissions of the White Company were those of the Columbia Company; that is to say, the White Company, in technical language of the law, was not an independent contractor, liable for its omissions.

The Court disallowed the testimony, and there was an exception by the defendant; but that issue was not argued in the briefs, and we assume it was abandoned.

2. The defendants have conceived that there was no need to print so much of the testimony, as it appears by question and answer; and they have by correct practice appealed from the Court's order allowing the same.  Of such there are 18 pages of the witness, Wilson's testimony; 12 pages of the witness, Odiorne; 7 pages of the witness, Nelson; 2 pages of the witness, Welborn, and 1 page of the witness, Rossman; or 40 pages all told.  The defendant's appeal is directed to a practice that has come to be a burden to litigants and a vexation to this Court.  There are many questions put to witnesses to influence a jury.  There is no need to put such in the case for appeal.  There is much irrelevant testimony adduced in every trial.  There is no need to repeat it here.  We have examined the testimony so printed by question and answer in the instant case, and we think fully one-half of it ought to have been omitted.  The respondent indicated at the bar a willingness to pay for it, and our inclination is that in the taxation of costs 20 pages of printed matter shall be charged to the respondent; but until a comprehensive rule, now under our consideration, is made to remedy the suggested evil, we make no present order.

3. The exception to the eighth request is twofold; that part designated as "a" suggests that the Court charged on the facts.  There is no foundation for the suggestion. There was no reference to the testimony; the charge was a definition of prudence, diligence, and reasonable care.  The jury was instructed that it consisted, not only of mechanical skill, that is, apt work with the hands, but it included also circumspection, that is, a state of mind looking ahead for probable consequences.

The part of the exception marked "b" suggests that the charge held defendants to a higher degree of proof to estab-

lish what constituted an act of God than the law requires.
The charge was the defendant must not only prove:
(1) That an act of God caused the death; but (2)
that it was the sole cause, not preventable by the
exercise of care on the defendant's part. There was no
dispute but that the death was caused by the elemental act
of God; the fact of death by lightning was alleged both in
the complaint and answer, and the poets have said, "Light-
ning does the will of God." The issuable matter was the
joinder to that power of the defendant's negligent acts of
omission and commission. The specific acts of negligence
were alleged, the failure to ground, and the wrapping of
the wires around the bushings. When the defendants
relied for a defense upon the act of God, as they did, it was
incumbent on them to show that there was no joinder to
that of their own negligent act. The rule is so stated in
*Slater* v. *Railroad,* 29 S. C. 96, 6 S. E. 936, and *Ferguson* v.
*Railroad,* 91 S. C. 64, 74 S. E. 129, *both of which were*
actions for lost freight. There is no sound reason to differ-
entiate the case at bar from those cases; to do so would be
to suggest a refinement which is more academic than sound.
The deceased was inside the house; the alleged acts of neg-
ligence were on the outside, and were in the particular
knowledge of the defendant, for they arose out of the
defendant's own knowledge and conduct. When the
defendants alleged, as they did, that the deceased met his
death by a *vis major,* and that, therefore, the defendants
were acquit, the answer of the law is that they are not
excused unless the *vis major* was the sole operating cause.
*The gist of it is* that the "act of God" *means in law,* not
only a *vis major,* but a *vis major uncoupled with negligence.*
If the defendants had stopped with proof of death by light-
ning, that would have excused the killing; they had to show
that such was the sole cause, in order to escape the conse-
quences.

But aside from all such considerations, there is another view of the subject. The plaintiff undertook to show by proof the aforesaid negligent acts of the defendants. The defendants offered testimony contra. The whole issue was before the jury, and the instruction amounted to the Court's telling the jury that on that issue the testimony of the defendants must preponderate, and that was so, because that was the only thing which could excuse the killing.

4. We have reserved for final consideration, and now come to, and the only real question in the case, and that is ought the Court to have sent the cause to a jury? It is true that there was no warrant in the Court to leave the jury to speculate, to conjecture, or to guess how Sloan got killed. That is a well recognized rule of law, applicable in this and every other like case. If there be a real difficulty, it lies as is generally so, in applying that law to this testimony. Thus some analysis of the testimony ought in justice to be made. The pleadings admit that Sloan met his death by atmospheric electricity; that is to say, by lightning. Thereout arose two signal issues of fact, the burden of proving which rested on the plaintiff. They are: (1) Was the lightning conveyed along the transmission line to the bushings, through the wall of the power house, into Sloan's body; and (2) *was that occasioned by the failure of the defendants to exercise due care in the construction and maintenance of the transmission lines?* (Italics added.) The testimony must have established by some sufficient and reasonable weight the affirmative of each of these propositions to have warranted the Court to send the case to the jury. The testimony makes no question about Sloan being where he was put to work, and where he ought to have been. One of the answers challenged that, but there was no testimony to support the allegation. It is true the action of atmospheric electricity proceeds sometimes by unknown laws, but surely not without law, so that

those. who act with the utmost precaution are sometimes overtaken by an altogether unexpected manifestation of its power. It has a law, "He made a way for the lightning of the thunder."

We take notice of the fact that for well-nigh a generation the ingenuity and the resources of men have been exploiting this mysterious power, and putting it to a common daily task. And juries sit daily to divine greater mysteries than the ways of electricity. They find and declare the *intent* of man, and with power to inflict for the finding of it, more than a judgment for the forfeiture of life. So, the jury's power in this case is not extraordinary.

Beyond question in the instant case, all the defendants' witnesses knew that a copper wire, strung for miles above the earth, was the best known conductor of electricity, and that it would conduct lightning out of the skies, and carry it to a certain exit. For this reason they testified the transmission lines were grounded at frequent intervals, a fact which was denied by the plaintiff, to conduct the fluid away from harm to men and into the earth. It was then proven that unless the lines were sufficiently grounded they might do just what was done in the instant case.

The fact assumed on all hands that the lightning which killed the laborer entered the building which he occupied. The plaintiff's case rests on proof that the entry was on the transmission line. An examination of the testimony of the four chief witnesses, Wilson and Odiorne, for the plaintiff, and Nelson and Welborn, for the defendants, establishes that fact by so much testimony as to warrant a jury to find the fact. The witness, Wilson, was within three feet of Sloan when Sloan was struck; he testified that, in his opinion, based upon the location and knowledge of electricity, the current came in on the transmission line. On cross-examination he said:

"I have not any particular reason to believe that it came in otherwise, because I know a little bit about the arrangement of the building in there that helps to make me form the opinion I have."

And, again, "knowing something about how electricity travels, and so on, I have some reasons to base my opinion on." The witness, Odiorne, was a subforeman at the power house. He testified he "imagined that the lightning came in on the transmission line, since they were nearest wires to Sloan, and the only wire in his opinion that ran in the direction the cloud passed over." He was asked, "Where did it sound to you, as an electrician, that it came from?" He answered, "I think it came from the line; I think it struck the line, sir."

The witness, Nelson, foreman for the J. G. White Company, only testified there was "no certainty how Mr. Sloan met his death." But he also testified that "an induced current could have come over that wire, from a cloud passing over the line." He was asked this question and gave this answer:

"Q. Now, Mr. Nelson, if there was a pop, as has been testified to, at the back, between the wall and the back of Mr. Sloan—because his back, it has been testified to, was to the wall—if there was a pop between the wall and Mr. Sloan's body, what would you expect, as an electrician? A. I would expect there was an electric discharge at that point."

The witness did not express the opinion, so far as we can find, that the bolt did not enter on the transmission line. The witness, Welborn, foreman of the General Electric Company, testified that the plaintiff's assertion that the bolt entered on the transmission line "is only theory." But he testified, also, "That was one source (the transmission line) that lightning could come in." He never expressed the opinion that the bolt did not come in on the transmission line. He did not suggest to the jury another probable chance for the bolt to have traveled. He wrote directly

after the event to Nelson to immediately remove the lines from the entrance bushings in the substation to a distance not less than 15 feet, "to prevent a recurrence of a similar accident." The circumstance that the defendants did not ground the line directly at the power house for fear it would imperil the numerous passers-by indicates they had reason to believe the transmission line would induce a current of electricity from the clouds. The preponderance of the evidence was that the lightning which killed Sloan entered the building on the transmission line.

On the other suggested issue of fact, that of sufficient precaution by the defendants, there was testimony on both sides of it. The evidence is plain and there is none contra that the transmission line was capable of inducing a current of electricity from the clouds; that once on the line the current would pass off it at the place of least resistance; that, if the line was well grounded, the current would pass there; that the line was not grounded *at* the power house; that if there was no sufficient ground, and the current got on the line, it would leave the line at the bushing and go through the wall of the power house into Sloan.

The issue was, Did the defendants reasonably provide against the harmful escape of lightning in the event it was induced on the lines? The proof is certain, and is not denied, that the lines were coiled around the bushings, and the ends were unprotected there from discharge, which some of the witnesses said was proper construction and some of the witnesses testified was improper construction; that there was no grounding at the power house; that the fact of discharge from the end of the line at the bushings tends to show there was insufficient grounding elsewhere. Nelson testified as follows:

"Now, if a current of electricity did strike this line, and did come towards the substation, and did come to those steel plates and did go through those wires and steel plates and. Sloan was placed on the inside of that western wall, like

that photograph G. shows that he was, would not you expect that current to go on through his body and down to the ground?    A. I would, if there was not any ground on the line."

Nelson did not know and Welborn did not know and Davis did not know, of *their own knowledge,* if there was any grounding at all.    The plaintiff's witnesses did not know anything about groundings.    As before stated the defendants had two witnesses, Murphy and Rossman, both foremen of the transmission lines, and servants of the J. G. White Company, who testified to groundings, the nearest of which Murphy said was within 200 feet of the power house.    Betwixt that point and the power house there was admittedly no grounding; and if there was a grounding 200 feet away from the power house, then it was insufficient if the lightning was induced on the line, else by defendants' witnesses the current would have gone that channel instead of that out at the bushings.

The *necessary inference* from all the testimony is that it would have been a negligent act for the defendants to have stretched for three months a copper transmission line three miles long, and to have stopped it immediately at the power house in which laborers were at work, *unless* that line was properly protected from static electricity.    Upon all the testimony the Court was right to leave it to the jury to say if the protection in the instant case was reasonably safe.

We are of the opinion that the judgment of the Circuit Court must be affirmed; and it is so ordered.

Mr. Chief Justice Gary and Mr. Justice Watts concur in the opinion delivered by Mr. Justice Gage.

Mr. Justice Hydrick, *dissenting.*    The judgment should be reversed for error in giving plaintiff's eighth request, which was, in part, as follows:

"The defendant who invokes the act of God as a defense has the burden of proving, not only that the act of God

caused the injury, but that it was the entire cause of the injury, and such injury could not have been prevented by the exercise of diligence, prudence, and reasonable care by the defendant."

The burden is upon a servant, who alleges that he was injured by the negligence of his master and seeks to recover damages therefor, to prove the negligence alleged, and that it was the proximate cause of his injury. This rule is elementary, and it has been uniformly recognized and applied by this Court. In such cases, there is no presumption of negligence. 4 Labatt's Mas. & Serv., sections 1599, 1603; 6 Thomp. Neg., sections 7695, 7698, 7719. At section 7698, the author says:

"Where the effect of the evidence is merely to establish that there were *two* independent causes, either one of which may have been the proximate cause of the injury, the burden is on the plaintiff to show that the cause for which the defendant is responsible was the one which produced the injury sought to be recovered for."

The contention of defendant that an alleged injury was caused by an act of God, or was an accident, is not an affirmative defense. Therefore, it may be proved under a general denial, for proof of the fact merely tends to disprove the allegation of negligence, and to rebut the plaintiff's evidence of negligence. The general rule is that, under a general denial, the defendant may introduce any evidence which merely tends to rebut the plaintiff's case. *Heiden* v. *R. Co.,* 84 S. C. 119, 65 S. E. 987. In accordance with this principle, the Court held in *Wilson* v. *Railway,* 51 S. C. 79, 28 S. E. 91, that, under a general denial, defendant could introduce evidence tending to show that the injury was caused by the negligence of a fellow servant of plaintiff; and, in *Strickland* v. *Capital City Mills,* 70 S. C. 211, 49 S. E. 478, where defendant alleged in its answer that, if plaintiff was injured, as alleged, the injury was caused by his own negligence, and not that of defendant, and the Court

instructed the jury that the burden of proving this allegation was on the defendant, this Court reversed the judgment, on the ground that it was not an affirmative defense, and that it was error to put the burden of proving it on defendant. To the same effect, see *Kennedy* v. *Railway,* 59 S. C. 535, 38 S. E. 169, and *Mitchiner* v. *Tel. Co.,* 70 S. C. 522, 50 S. E. 190.   Analogous in principle is *State* v. *McDaniel,* 68 S. C. 318, 47 S. E. 384, 102 Am. St. Rep. 661, where this Court held that, under the plea of "not guilty," on indictment for murder, defendant could offer testimony tending to prove that the killing was an accident, and reversed the judgment for error in the instruction that it was an affirmative defense, and the burden of proving it was on defendant.

The instruction given in the case at bar applies in actions against carriers and bailees for hire for loss or damage to goods in their custody (*Ferguson* v. *Railway,* 91 S. C. 61, 74 S. E. 129; *Fleischman* v. *Railway,* 76 S. C. 237, 56 S. E. 974, 9 L. R. A. (N. S.) 519), for reasons of public policy, since the cause of loss or damage is peculiarly within their knowledge; and it would be difficult, if not impossible, for the owner to prove negligence.   Therefore, the law raises a presumption of negligence in such cases.   But there is no reason, and I have not been able to find any authority, for any such presumption in a case like this, where the plaintiff may be presumed to know as much about the cause of the injury as the defendant, or has equal means of ascertaining the cause of it.

Suppose the evidence was evenly balanced on the issue whether the injury was caused by defendant's negligence or the act of God, if the burden of proving that it was caused by defendant's negligence was on plaintiff, as I think it was, then the verdict should have been for defendant.   On the other hand, if the burden was on defendant to prove that the sole cause of the injury was an act of God, as the jury were instructed, then the burden was put upon defendant to

disprove negligence, and not upon the plaintiff to prove it, as the rule requires, and though the evidence was evenly balanced, the jury had to find for plaintiff. The instruction turned the rule upside down.

The opinion of MR. JUSTICE GAGE seems to me to be inconsistent in its holdings, for, further on, he says:

"The pleadings admit that Sloan met his death by atmospheric electricity, that is to say, by lightning. Thereout arose two signal issues of fact, *the burden of proving which rested on the plaintiff.* They are: (1) Was the lightning conveyed along the transmission line to the bushings, through the wall of the power house, into Sloan's body; and (2) *was that occasioned by the failure of the defendants to exercise due care in the construction and maintenance of the transmission lines?*" (Italics added.)

The words italicized show that he recognizes the general rule that the burden is upon plaintiff to prove the negligence alleged, which is certainly at variance with the previous holding that the burden was on defendants to prove that the act of God was the sole cause of the injury, and "that there was no joinder to that of their own negligent act." It cannot be said that the error was nullified, or made harmless, by the general instruction that the burden was upon plaintiff to prove her case by the preponderance of evidence, because at the insistent request of plaintiff's attorney, it was repeated at the end of the charge with an emphasis that could not have failed to impress the jury as appears from the following colloquy between plaintiff's attorney and the Court:

"The Court: Now, as to contributory negligence, as far as proving contributory negligence, the burden of proof is on the party setting up, claiming contributory negligence, to make out that. Now, what is it, Mr. Evans? Mr. Evans: And also the assumption of risk, your Honor. The Court: And also the assumption of risk. Mr. Evans: When they set it up. And also when they set up the act of God, they must prove that it was the sole cause of it,

and no human agency.    The Court: Mr. Evans, I charged ·
that, and it was carefully framed, and that was one of your  ·
main requests to charge.    Mr. Evans: Yes, sir; it was one
of my main requests.    The Court: Didn't I charge it?    Mr.
Evans: Thank you.    I have nothing more to say.    The
Court: I charged it."

I dissent also from the conclusion reached as to the
amount of unnecessary printing in the "case," which shall
be charged to the respondent.    If this Court has to examine
microscopically every "case" in which unnecessary matter
is set forth, contrary to the rules of the Court, to determine
with exact precision how many pages of the "case" shall
be charged to the parties respectively, its labors will be
increased vastly more than merely reading the unnecessary
matter.    The application of the rule will become more
burdensome than the evil it was intended to remedy.    When
there is a culpable and substantial failure to comply with
the rule, the party responsible for it should be penalized by
being required to pay all the costs of printing the "case."

In all other respects I concur in the opinion of MR. JUS-
TICE GAGE.

MR. JUSTICE FRASER concurs in the dissenting opinion
delivered by MR. JUSTICE HYDRICK.